UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.: |
| v. | : | Filed: |
| DANIEL MOSHE NAEH, A/K/A DANI NAEH, | : | Violations: 15 U.S.C. § 1<br>18 U.S.C. § 371<br>18 U.S.C. § 1343 |
| Defendant. | | |

**10 CRIM 139**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2̲8̲ ̲F̲E̲B̲ ̲2̲0̲1̲0̲

## INFORMATION

The United States of America, acting through its attorneys, charges:

1. Daniel Moshe Naeh, a/k/a Dani Naeh ("NAEH") is hereby made a defendant on the charge stated below.

### COUNT ONE - CONSPIRACY TO RESTRAIN TRADE
(15 U.S.C. § 1)

#### I. THE RELEVANT PARTIES AND ENTITIES

During the period covered by this Count:

2. Defendant NAEH was a resident of California until August 2002. In August 2002, NAEH moved to Israel and is currently a resident of Israel.

3. Defendant NAEH was an employee at Rubin/Chambers, Dunhill Insurance Services Inc. dba Chambers, Dunhill & Rubin Co. and CDR Financial Products, Inc. ("CDR"), a company located in Beverly Hills, California that marketed financial products and services, including services as a broker or advisor to various municipalities throughout

the United States.

4. Whenever in this Count reference is made to any act, deed, or transaction of any corporation, such allegation shall be deemed to mean that the corporation engaged in such act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

5. Various other persons and entities, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof. They included CDR, CDR's owner and other CDR executives (collectively, "CDR co-conspirators").

## II. BACKGROUND

6. Municipal bonds are issued by government entities, such as states, counties and cities, or quasi-governmental entities, such as public authorities and school, utility or water districts, to raise money for operating funds or for specific projects, such as the construction of public facilities, and to refinance outstanding municipal debt. In some instances, the entity issuing the bond turns the money over to a not-for-profit entity, such as a school or hospital, or an entity that will spend the money for a specific public purpose, such as the construction of low-cost housing or waste treatment facilities. Both the entities that issue municipal bonds and the entities that receive and spend the money are, unless otherwise stated, collectively referred to herein as "issuers," "municipal issuers," or

"municipalities." In 2007 and 2008, combined, approximately $800 billion in municipal bonds were issued in the United States.

7. The money an issuer raises from a municipal bond offering ("bond proceeds") is typically spent over a period of time rather than immediately, in one lump sum. The issuer frequently invests some or all of the bond proceeds in an investment product (sometimes referred to as an "investment agreement") that is designed for its specific needs. Investment agreements vary in size from a few hundred thousand dollars to several hundred million dollars and in duration from as short as one month to as long as thirty years.

8. Major financial institutions, including banks, investment banks, insurance companies, and financial services companies (collectively "providers") sell investment agreements through their employees or agents ("marketers").

9. Issuers usually select providers of investment agreements through bona fide competitive bidding procedures that are designed to comply with federal tax laws and United States Department of the Treasury regulations relating to the tax-exempt status of municipal bonds. Compliance with these regulations is monitored by the Internal Revenue Service ("IRS"), which is entitled to receive a portion of the earnings from a municipality's investment agreement under certain circumstances. Among other things, each provider submitting a bid typically certifies that specific Treasury regulations have been followed, including that the provider did not consult with any other potential provider

about its bid and that all providers had an equal opportunity to bid, commonly referred to as the no "last looks" provision.

10. Issuers often hire third parties ("brokers") to act as their agents in conducting a <u>bona fide</u> competitive bidding process and complying with the relevant Treasury regulations. CDR was such a broker, and defendant NAEH was employed by CDR. Brokers owe a fiduciary duty to issuers that hire them and are required to act for the benefit of the issuer when conducting the competitive bidding process. The broker's fee for conducting a <u>bona fide</u> competitive bidding process is generally paid by the winning provider, which takes into account the cost of the broker's fee when calculating its bid and discloses that fee to the issuer.

11. Brokers offer a variety of services, including offering suggestions about the availability and suitability of investment products, drafting bid specifications, and identifying the most competitive, qualified providers to be solicited as bidders. In some cases, the broker decides which providers will be solicited to bid without consulting with the issuer or any of the other professional representatives advising the issuer.

12. Brokers are usually responsible for distributing the bid packages (specifications and bid forms) to providers selected to receive them, usually via e-mail; keeping in touch with the potential bidders to answer questions about the bid specifications; conducting the bidding process, which typically involves receiving the providers' bids by telephone at a time identified in the bid specifications, followed by a

confirming copy of the bid via facsimile. After reviewing the bids to ensure conformity with the specifications, brokers then inform the issuer of the outcome of the bid, including the identity of the winning, qualified bidder and, if appropriate, any conditions that deviate from the specifications. Brokers are often required by the issuer to provide written certification that the bidding procedures complied with the relevant Treasury regulations.

13. Depending on the structure of the bid, providers may be asked to quote only the interest rate to be paid on funds on deposit for the duration of the agreement or they may be asked to submit a bid in the form of a dollar amount or date (sometimes referred to as the "price" or "price level" of a bid). In a typical investment agreement, providers are asked to quote only an interest rate and, generally, the agreement is awarded to the provider quoting the highest rate.

14. Many brokers that conduct bona fide competitive bidding for investment agreements subject to the Treasury regulations are also hired by municipalities and other quasi-governmental entities to conduct bona fide competitive bidding in connection with the award of other contracts involving public funds, even though those contracts are not subject to the Treasury regulations. These contracts (collectively, "other municipal finance contracts") include, but are not limited to, investment agreements for taxable municipal bonds; investment agreements for funds borrowed by entities in which the federal government or any municipal entity is a participant; and derivative contracts, which are contracts between a municipal issuer and a financial institution that are designed

to manage or transfer some or all of the interest rate risk associated with a municipal bond issue. Other municipal finance contracts do not include underwriting contracts. CDR acted as a broker in the award of other municipal finance contracts, and defendant NAEH was employed by CDR.

## III. DESCRIPTION OF THE OFFENSE

15. From at least as early as 1998 until at least November 2006, the exact dates being unknown to the United States, defendant NAEH and co-conspirators engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

16. The aforesaid combination and conspiracy consisted of an agreement, understanding, and concert of action among defendant NAEH and co-conspirators, the substantial terms of which were to allocate and rig bids for investment agreements or other municipal finance contracts.

## IV. THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

17. For the purpose of forming and effectuating the aforesaid combination and conspiracy, defendant NAEH and co-conspirators did those things which they combined and conspired to do, including, among other things:

(a) designating in advance of the submission of bids to defendant NAEH's employer, CDR, which provider among the co-conspirator providers would be the winning bidder for certain investment agreements or other municipal finance contracts;

(b) discussing and agreeing on the prices or price levels that co-conspirator providers would bid for certain investment agreements or other municipal finance contracts;

(c) submitting or causing to be submitted to defendant NAEH's employer, CDR, intentionally losing bids for certain investment agreements or other municipal finance contracts with the understanding that co-conspirator providers submitting the intentionally losing bids would be allocated other investment agreements or other municipal finance contracts. The intentionally losing bids made it appear both to the municipalities that had hired CDR as their broker and, where appropriate, to the IRS that NAEH and certain of the CDR co-conspirators solicited potential providers that would and did compete for those agreements and contracts, when, in fact, they had not;

(d) falsely certifying and forwarding false certifications that the bidding for certain investment agreements or other municipal finance contracts was in compliance with the relevant Treasury regulations or was otherwise competitive;

(e) agreeing to pay and paying CDR kickbacks in the form of fees that were inflated, relative to the services performed, or unearned. These payments were in exchange for defendant NAEH'S assistance and certain of the CDR co-conspirators' assistance in controlling the bidding process and for ensuring that certain co-conspirator providers won the bids they were allocated. Unlike the fees CDR was paid as a broker for conducting the bidding process, these fees were not disclosed to the municipalities that had

hired CDR or to the IRS; and

        (f)    paying municipalities or causing municipalities to be paid artificially determined or suppressed yields for the duration of certain investment agreements or other municipal finance contracts, thereby increasing the profitability of those agreements or contracts for the winning co-conspirator provider for their duration.

    18.    For example, on numerous occasions, a co-conspirator provider recommended to a municipality that it hire defendant NAEH'S employer, CDR, as broker, typically where the provider was the senior underwriter on an upcoming bond issue. In exchange, NAEH and certain of the CDR co-conspirators attempted to ensure and did ensure that the same provider won one or more of the investment agreements associated with that same bond issue by recommending terms for the investment agreement(s) that favored that provider, selecting other providers to bid that would and did submit intentionally losing bids, and, after receiving information from the intended winning provider regarding the price or price levels it intended to bid, telling the other providers what prices or price levels to bid. As a result, the intended winning provider increased its profits from the investment agreement(s) by paying interest to the municipality for the duration of the investment agreement(s) at a rate that was artificially low.

## V. INTERSTATE TRADE AND COMMERCE

    19.    From at least as early as 1998 until at least November 2006, pursuant to the investment agreements and other municipal finance contracts that are the subject of

this Count, defendant NAEH and co-conspirators caused substantial amounts of money to be transferred between co-conspirator providers and municipal issuers and other government or quasi-governmental entities throughout the United States.

20. The activities of defendant NAEH and co-conspirators with respect to the aforementioned investment agreements and other municipal finance contracts were within the flow of, and substantially affected, interstate trade and commerce.

## VI. JURISDICTION AND VENUE

21. The aforesaid combination and conspiracy was formed and carried out, in part, within the Southern District of New York within the five years preceding the filing of this information.

IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1

## COUNT TWO - CONSPIRACY
(18 U.S.C. § 371)

The United States of America further charges:

22. Daniel Moshe Naeh, a/k/a Dani Naeh ("NAEH") is hereby made a defendant on the charge stated below.

23. Paragraphs 2 through 14 of Count One of this Information are repeated, realleged, and incorporated in Count Two as if fully set forth in this Count.

## VII. THE RELEVANT PARTIES AND ENTITIES

24. Various other persons and entities, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof.

They included the CDR co-conspirators set forth in Paragraph 5. They also included Provider A, a group of related financial services companies located in New York, New York and owned or controlled by a company headquartered in New York, New York, and Marketer A, a representative of Provider A. Marketer A worked at Provider A from approximately August 2001 until at least November 2006.

25. Financial Institution A was a financial institution that was a branch or agency of a foreign bank.

## VIII. DESCRIPTION OF THE OFFENSE

26. From at least as early as August 2001 until at least November 2006, the exact dates being unknown to the United States, in the Southern District of New York and elsewhere, defendant NAEH and co-conspirators unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Section 1343, and to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of the Treasury, all in violation of Title 18, United States Code, Section 371.

27. It was a part and an object of the conspiracy that defendant NAEH and co-conspirators, having devised and intending to devise a scheme and artifice to defraud municipalities and to obtain money and property from municipalities by means of false and fraudulent pretenses, representations, and promises, unlawfully, willfully and knowingly,

for the purpose of executing such scheme and artifice, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

28. It was further a part and an object of the conspiracy that defendant NAEH and co-conspirators would and did defraud the United States and the IRS by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue due and owing from municipal issuers and in exercising its responsibilities to monitor compliance with Treasury regulations related to tax-exempt municipal bonds, in violation of Title 18, United States Code, Section 371.

## IX. THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

29. Defendant NAEH and co-conspirators engaged in an ongoing scheme to defraud municipalities and the IRS by causing municipal issuers to enter into investment agreements and other municipal finance contracts with Provider A at artificially determined or suppressed price levels through the control and manipulation of the bidding for those agreements and contracts. In exchange, NAEH and certain of the CDR co-conspirators asked that Provider A pay kickbacks to CDR. Provider A agreed and

arranged to pay kickbacks to CDR in the following manner: the kickbacks were disguised as fees ("hedge fees") that purported to compensate CDR for acting as a broker in arranging financial transactions known as swaps between Provider A and Financial Institution A, but those fees were, in fact, unearned or inflated. The rates of Provider A's swaps with Financial Institution A were adjusted to include the hedge fees Provider A wanted to pay CDR. Financial Institution A then paid the hedge fees to CDR. Neither CDR nor Provider A disclosed to issuers that Provider A had agreed to pay CDR hedge fees in connection with the award and execution of investment agreements or other municipal finance contracts. In some cases, these kickbacks reduced the amount of money the municipalities received and continue to receive pursuant to investment agreements or other municipal finance contracts awarded to Provider A.

30. Defendant NAEH and co-conspirators attempted to increase the number and profitability of investment agreements and other municipal finance contracts awarded to Provider A by controlling which other providers were solicited for bids and securing the agreement of other co-conspirator providers to submit intentionally losing bids, where possible, and by arranging for Marketer A to submit Provider A's bid last. Before Marketer A actually decided what price to bid, NAEH and certain of the CDR co-conspirators received and reviewed bids from other providers and gave Marketer A information about the prices, price levels or conditions of those bids, including, on occasion, the specific amounts other providers had bid. Marketer A then used that

information to determine Provider A's bid. On some occasions, NAEH and certain of the CDR co-conspirators told Marketer A that he could lower Provider A's bid and still win the contracts and, further, suggested the exact amount by or to which the bid could be reduced. Marketer A followed these suggestions. As a result of information that NAEH and certain of the CDR co-conspirators gave Marketer A about bids from other providers, Provider A was awarded and has performed and is scheduled to continue to perform investment agreements and other municipal finance contracts at artificially determined levels that deprived and will continue to deprive municipalities of money.

31. From time to time, defendant NAEH and certain of the CDR co-conspirators asked Marketer A to submit intentionally losing bids for other investment agreements or other municipal finance contracts, in order to create the appearance that Provider A was competing for agreements or contracts when, in fact, it was not.

32. Defendant NAEH and co-conspirators falsely certified or caused to be certified that the bidding process was bona fide and complied with relevant Treasury regulations or was otherwise competitive and received and forwarded bids and certifications from Marketer A or Provider A and other co-conspirator providers containing corresponding false representations.

33. By secretly controlling and manipulating the bidding for investment agreements and other municipal finance contracts, defendant NAEH and co-conspirators caused municipalities not to file required reports or to file inaccurate reports with the IRS,

and to fail to give the IRS or the Treasury money to which it was entitled, thus jeopardizing the tax-exempt status of the underlying bonds.

## X. OVERT ACTS

34. In furtherance of the conspiracy and to effect the illegal objects thereof, defendant NAEH and co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

(a) On numerous occasions, at or about the time the bid specifications stated that bids were due, defendant NAEH participated in interstate telephone calls between New York, New York and California during which he gave Marketer A information about the prices, price levels, or conditions of bids from other providers. Marketer A then used that information to determine Provider A's bid.

(b) On numerous occasions, at or about the time the bid specifications stated that bids were due, defendant NAEH participated in interstate telephone calls between New York, New York and California during which NAEH asked Marketer A to submit intentionally losing bids for investment agreements and other municipal finance contracts and provided Marketer A with pricing information to assist Marketer A in doing so.

(c) On numerous occasions, prior to taking bids for certain investment agreements or other municipal finance contracts, defendant NAEH participated in interstate telephone calls between New York, New York and California with Marketer A

14

and other co-conspirators during which they made or sought to make arrangements for NAEH'S employer, CDR, to receive kickbacks in the form of purported hedge fees that were not disclosed to the municipality. On at least ten occasions between approximately November 2001 and August 2005, CDR received kickbacks ranging in size from $4,500 to $475,000.

(d) On numerous occasions, defendant NAEH falsely certified or caused to be certified that the bidding process complied with relevant Treasury regulations, or was otherwise competitive, and forwarded bids and certifications from Marketer A or Provider A and other co-conspirator providers containing corresponding false representations.

(e) On numerous occasions, Provider A paid via wire transfer and is scheduled to continue to pay municipalities interest on money it received pursuant to investment agreements or other municipal finance contracts whose rates were artificially determined and suppressed.

(f) With respect to the award and performance of an investment agreement for a state health and educational facilities authority, defendant NAEH and co-conspirators committed the following overt acts, among others:

(i) on or about August 12, 2002, during an interstate telephone conversation between New York, New York and California, defendant NAEH spoke with Marketer A about the upcoming bid for the investment agreement;

15

(ii) on or about August 16, 2002, during an interstate telephone conversation between New York, New York and California, defendant NAEH and his supervisor discussed and agreed with Marketer A the number to bid for Provider A to win the investment agreement;

(iii) on or about August 16, 2002, after Provider A was awarded the investment agreement, Marketer A made arrangements for Provider A to pay CDR a kickback in the form of a purported hedge fee in connection with a swap relating to the investment agreement;

(iv) on or about August 20, 2002, defendant NAEH's employer, CDR, received via wire transfer a kickback in the form of a $475,000 purported hedge fee in connection with the swap between Provider A and a financial institution related to this investment agreement; and

(v) beginning approximately December 1, 2002 and continuing until at least November 2006, Provider A made and continues to make semi-annual interest payments on the investment agreement at a rate that was artificially suppressed.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371

## COUNT THREE - WIRE FRAUD
(18 U.S.C. § 1343)

The United States of America further charges:

35. Daniel Moshe Naeh, a/k/a Dani Naeh ("NAEH") is hereby made a defendant on the charge stated below.

36. Paragraphs 2 through 14 of Count One and Paragraph 24 of Count Two are repeated, realleged and incorporated in Count Three of the Information as if fully set forth in this Count.

## XI. DESCRIPTION OF THE OFFENSE

37. On or about the dates indicated below, in the Southern District of New York and elsewhere, defendant NAEH and other persons, known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud municipal issuers and to obtain money and property from these municipal issuers by means of false and fraudulent pretenses, representations and promises, including the municipal issuer referenced in Paragraph 34(f) above, for the purpose of executing such scheme and artifice, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures or sounds the following:

38. On or about May 31, 2006, via interstate wire transfer from New York, New York to Missouri, defendant NAEH and his employer, CDR, caused Provider A to make an interest payment of approximately $442,341.39 to a state health and educational facilities authority, which payment was artificially suppressed because at the time that Marketer A determined Provider A's bid, he was asked to pay and agreed to pay a kickback to CDR that amounted to $475,000.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1343

Dated: 02/23/10

_____
CHRISTINE A. VARNEY
Assistant Attorney General

_____
SCOTT D. HAMMOND
Deputy Assistant Attorney General

_____
MARC SIEGEL
Director of Criminal Enforcemenr

_____
RALPH T. GIORDANO
Chief, New York Office

_____
REBECCA MEIKLEJOHN
STEVEN TUGANDER
KEVIN B. HART
MICHELLE RINDONE
Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 264-0654

_____
PREET BHARARA
United States Attorney
Southern District of New York